**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230229-U

Order filed December 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Iroquois County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0229 Circuit No. 19-CF-119 |
| | ) | |
| ARTHUR C. JENSEN, | ) ) | Honorable Michael C. Sabol, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE McDADE delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The circuit court did not err in denying defendant's motion to suppress statements.

¶ 2    Defendant, Arthur C. Jensen, appeals his conviction for first degree murder, arguing solely that the Iroquois County circuit court erred in denying his motion to suppress statements he made to the police. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On August 7, 2019, the State indicted defendant on two counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)). On March 4, 2022, defendant filed a motion to suppress statements which, relevant to this appeal, requested the suppression of inculpatory statements made by defendant to Sheldon Police Chief Bryan Havens. As far as we can discern from the record, the only inculpatory statements that were at issue were the following: "I have an anger issue," made in response to Havens asking what was going on; "I fucking choked her to death. She's dead," made in response to Havens asking what defendant's previous statement meant; "[T]he little girl from the yard sale. She was here the other day to buy Pocahontas toys," made in response to Havens asking who was dead; "I'm sure," made in response to Havens asking whether defendant was certain that the girl was dead; and "[S]he's in there. I drug her in there," made in response to Havens asking where the girl was. Defendant's motion alleged that he was in custody when he made the statements in response to investigatory questioning.

¶ 5        At the hearing on the motion to suppress statements, Deputy Douglas Brenner of the Iroquois County Sheriff's Department testified that on August 5, 2019, at approximately 4:30 p.m., he responded to a call at a trailer in Sheldon. The caller, Joan Kish, indicated that she and her brother, Steven Cox, had heard sounds coming from a neighboring residence that sounded like a person was being sexually assaulted. Upon speaking with Kish and Cox, Brenner learned that they had gone to defendant's trailer to speak with him, and they heard noises and screaming coming from defendant's residence. They disclosed that initially they did not know whether "there was a porn being played inside or if there was an actual incident going on." Kish and Cox left defendant's residence and "waited sometime" before calling the police.

¶ 6        Brenner knocked on defendant's door and no one answered the door. Brenner remained at the residence for approximately one hour and 15 minutes. During that time, Brenner gathered

2

information, including phone numbers for defendant and his wife, Sue Jensen, and spoke with neighbors. Brenner called both defendant and Sue. They did not respond, and Brenner left messages. Brenner testified that it was common for people not to answer his calls because he had a restricted phone number. Brenner asked another individual to attempt to contact defendant. That person was able to reach defendant on the phone and told Brenner that defendant said he was 20 minutes away from the residence.

¶ 7        At approximately 5:45 p.m., Brenner received another emergency call and left defendant's residence. Brenner confirmed that at the time he left, no one had been reported missing and he did not know if anyone was inside defendant's trailer. Brenner testified that his "gut told [him] something was wrong" but he could not arrest people or obtain search warrants based only on that feeling. Brenner spoke with Havens to discuss the situation. He asked Havens to check out defendant's residence once he started his shift.

¶ 8        After leaving the scene, Brenner received two phone calls from Havens. During the first call, Havens informed Brenner that defendant had called him and asked to speak with him but did not want Brenner present. On the second call, Havens told Brenner that he needed him at the residence. Havens indicated that defendant told him he had strangled a girl later identified as Adara Bunn, and Havens did not know what to do. Havens entered the garage while he was talking to Brenner. Havens told Brenner that he could see Bunn lying on the floor in the living room and asked if he should check to see if she was breathing. Brenner told Havens to check, and Havens indicated that Bunn was dead.

¶ 9        When Brenner returned to the residence, defendant was sitting handcuffed in the back of Havens's squad car. Brenner asked Havens if he had checked Bunn's vitals. Havens indicated that he had made a visual observation that Bunn was discolored and not breathing but had not

3

approached her or checked for a pulse. Brenner told Havens that they still needed to check Bunn and they entered the residence. After feeling no pulse on Bunn, Brenner quickly looked in each room to make sure no one else was present. He indicated this was standard procedure to secure the area. He did not search the residence for anything else. Shortly thereafter, Bunn was confirmed to be deceased by emergency medical technicians (EMT).

¶ 10      Havens testified that at the time of the incident he was working with the Watseka and Sheldon Police Departments. On August 5, 2019, he was scheduled to work in Sheldon at 6 p.m. Havens received a call from Brenner at approximately 4:30 p.m. Brenner advised him that there was a disturbance call for defendant's residence. At approximately 5:30 p.m., Havens received another call from Brenner informing him that he was unable to contact anyone from the residence. Havens told Brenner he would try to contact the residents when he started his shift in Sheldon.

¶ 11      At 5:50 p.m., Sue called Havens. She told him that a neighbor informed her that the county police were at her trailer and wanted to know what was going on. Havens told Sue he did not know but would be following up. Sue gave Havens defendant's phone number and asked him to call defendant.

¶ 12      Approximately 15 minutes later, Havens received a call from defendant. Defendant stated that the county police had just left his trailer. Havens asked defendant what was going on. Defendant asked if Havens was working in Sheldon that night and if he would come by when he had the time. Havens agreed and again asked defendant what was going on. Defendant said "well, I will give myself up to you, but not county." Havens asked, "give up what[?]" Defendant responded that Havens should "swing by whenever you have time" and call first so he could secure his dogs. Havens testified that he did not equate defendant's statement with an intent to

4

turn himself in because to Havens's knowledge no crime had occurred. He was only aware of an ongoing investigation; he did not know what was being investigated. Havens indicated that, during the phone conversation, defendant seemed very calm and collected. Havens changed into his Sheldon Police Department uniform which consisted of a black polo shirt, Kevlar vest, badge, and gun, and then went to defendant's residence.

¶ 13   Havens called defendant upon arrival, as requested. Defendant informed Havens that he would be exiting through the garage door. Less than a minute later, the garage door opened, and defendant stood in front of the door with his hands up. Defendant walked toward a pickup truck that was parked in the driveway and placed his hands on the tailgate. Havens did not give defendant any *Miranda* warnings because he was not in custody. He asked defendant what was going on. Defendant stated, "you know that I have an anger issue." Havens denied knowing that fact and asked defendant what that meant. Defendant replied, "it means I fucking choked her to death. She's dead." Havens asked defendant "who is dead[?]" Defendant explained it was "the little girl from the yard sale. She was here the other day to buy Pocahontas toys." Havens asked defendant if he was sure that she was dead and where she was. Defendant nodded behind him and stated, "she's in there. I drug her in there."

¶ 14   At that point, Havens detained defendant, handcuffing him and placing him in the back of his squad car. Havens radioed dispatch and requested an ambulance for a "potential choking victim." Havens explained that, at that time, he was unsure whether Bunn was deceased or merely unconscious and in need of aid. Havens called Brenner and asked him to return to the trailer. Havens told Brenner that defendant had informed him that he had killed someone, and defendant would be unsupervised in his squad car while Havens went inside to attempt to render

aid. Havens testified that he had previously received first aid training and had held an EMT license.

¶ 15      Havens walked through the open garage door. Upon entering the garage, Havens could see into the living room through a glass door that led to the trailer's interior. Havens observed Bunn lying on her back on the floor. Havens entered the residence to check on Bunn. Bunn's skin was gray, and she did not appear to be breathing. Havens left the residence and began to secure the scene. He testified that at no point in time did he draw or even touch his weapon.

¶ 16      Iroquois County Sheriff Clinton Perzee testified that on August 5, 2019, he was employed as an investigator. He was called to defendant's trailer to investigate a homicide. When Perzee arrived, defendant was handcuffed in the back of Havens's squad car. Perzee removed defendant from the squad car and uncuffed him. Perzee read defendant a consent form to search his residence and a form containing his *Miranda* warnings. Defendant gave consent to search the trailer and signed both forms. Perzee did not ask defendant any questions.

¶ 17      The court denied the motion to suppress on November 7, 2022. It found that defendant's statements to Havens were not subject to *Miranda* warnings. The court reasoned that (1) defendant chose the time and place to speak with Havens; (2) the interaction was short; (3) the mode of questioning was straightforward and included general questions about what was happening because Havens was unsure what was going on; (4) the interaction contained no raised voices, yelling, or threats; (5) defendant chose the manner in which he exited the house, where he went, and where he put his hands; (6) Havens was the only police officer present and had not frisked, searched, or directed defendant to do anything; (7) Havens did not draw his weapon; and (8) defendant displayed no intellectual disabilities or mental health issues. The

6

court found that, under these circumstances, a reasonable person would not have believed they were in custody for the purposes of *Miranda* until after defendant admitted to strangling Bunn. The court found that a reasonable person would feel they were not free to leave once that admission was made. However, the court found that the questions that Havens asked after defendant's admission were follow-up questions for clarification not interrogation and did not warrant suppression.

¶ 18    The case proceeded to a jury trial on March 6, 2023. In addition to the information above, the following evidence was adduced at trial. Bunn attended multiple garage sales in Sheldon on August 3, 2019, including a sale at defendant's trailer. Bunn had purchased Disney items from defendant. She returned to defendant's trailer the next day to see if he had any items available. Defendant told Bunn to return the next day. That same day, on August 4, 2019, defendant asked a number of inappropriate sexual questions regarding Bunn to her ex-boyfriend. Defendant had also stated that Bunn had "really grown into" her body and "it would be better if she was 18." Bunn returned to defendant's trailer on August 5, 2019, as directed, to see what other items he had available. Bunn's cause of death was determined to be ligature strangulation. A blue nylon rope found wrapped around Bunn's neck contained both her and defendant's DNA.

¶ 19    Defendant testified that after Bunn had purchased items from his garage sale, she returned to his residence and asked about a specific item which he had just packed away. Defendant retrieved the item, and she left. Defendant denied making inappropriate comments to her ex-boyfriend, indicating that they had been engaged in "guy talk" but he did not say anything specifically about Bunn. On August 5, 2019, Bunn appeared at defendant's trailer and asked about other Disney items. Defendant informed her that he had not had a chance to look through his belongings yet. Bunn would not leave defendant's house, so he grabbed her by the shoulders,

7

turned her around, and tried to shove her through the doorway. She "braced back and pushed against [defendant] and that's when a struggle started." Defendant grabbed her, removed a length of rope from his back pocket and indicated that "pretty much everything [was] pretty much a blur." Defendant was just trying to get her out of his trailer.

¶ 20    The jury found defendant guilty of both counts of first degree murder. Defendant filed a motion for a new trial which argued, *inter alia*, that the court had erred in denying his motion to suppress. The court denied the motion. Defendant was sentenced to 50 years' imprisonment. Defendant appeals.

¶ 21                                II. ANALYSIS

¶ 22    On appeal, defendant argues that the court erred in denying his motion to suppress statements. Defendant contends that the totality of the circumstances established that defendant was in custody and impermissibly subjected to interrogation without the required *Miranda* warnings where Havens was aware that defendant was a suspect in a criminal investigation who intended to surrender himself to the police.

¶ 23    When determining whether the court properly ruled on a motion to suppress evidence, we defer to the findings of fact and credibility determinations made by the court unless they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). "However, a reviewing court reviews *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted." *People v. Smith*, 2016 IL 119659, ¶ 43.

¶ 24    If a person being questioned by law enforcement has been " 'taken into custody or otherwise deprived of his freedom of action in any significant way,' " they must be apprised of their *Miranda* rights. *Slater*, 228 Ill. 2d at 149 (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The finding of custody is essential as *Miranda* warnings are necessary to ensure that

8

defendants are not inherently coerced into making inculpatory statements by their custodial surroundings. *Id.* "[I]n determining whether a person is 'in custody' for purposes of *Miranda*, a court should first ascertain and examine the circumstances surrounding the interrogation, and then ask if, given those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *People v. Braggs*, 209 Ill. 2d 492, 506 (2003). The second inquiry is objective, determining "what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes." *Id.*

¶ 25    When examining the circumstances of the interrogation, the supreme court has recognized several factors to be considered:

> "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused."
> *Slater*, 228 Ill. 2d at 150.

Courts may also consider "the degree of police control over the environment in which the interrogation takes place, and in particular whether the suspect's freedom of movement is physically restrained or otherwise significantly curtailed." (Internal quotation marks omitted.) *People v. Logan*, 2024 IL 129054, ¶ 60.

¶ 26    Here, the circumstances surrounding the questioning establish that defendant was not in custody prior to volunteering that he killed Bunn. Whether Havens went to defendant's residence suspecting defendant of committing sexual assault based on the information relayed to him by

Brenner is immaterial where this belief did not affect the conversation Havens had with defendant. See *id.* ("An officer's belief in the individual's guilt is relevant only to the extent that the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." (Internal quotation marks omitted.)). Havens did not manifest his suspicion to defendant upon arrival.

¶ 27         Defendant requested that Havens come to his residence. The questioning was brief and occurred outside of defendant's residence, during daylight hours, in plain view of anyone in the area. Havens was the only officer present, and he made no show of force or attempt to physically restrain defendant. The mood of the questioning was calm and informal. Havens's questions were inquisitive and not accusatory in nature. Defendant was not informed that he had to answer any questions or that he was not free to leave. Havens exercised little to no control over the situation where defendant determined when and where the questioning would occur when he invited Havens to his residence. Defendant was an adult and able to effectively communicate with and understand Havens.

¶ 28         After defendant's initial statement that he "choked her to death," a reasonable person would not have felt free to terminate the encounter with Havens and leave. However, Havens's follow-up questioning was a neutral reflexive response intended to clarify defendant's voluntary declaration which does not require suppression. See *People v. Peo*, 391 Ill. App. 3d 815, 821 (2009) ("[S]imple questions seeking clarification of volunteered statements do not require *Miranda* warnings."); see also *Andersen v. Thieret*, 903 F.2d 526, 532 (7th Cir. 1990) (not interrogation for the police to ask " 'Who?' " after the defendant voluntarily stated, " 'I stabbed her' "). Accordingly, the court did not err in denying defendant's motion to suppress statements.

10

¶ 29                                        III. CONCLUSION

¶ 30            The judgment of the circuit court of Iroquois County is affirmed.

¶ 31            Affirmed.